**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

SOUTH RIVER CAPITAL, LLC,　　　　*

　　　*Plaintiff*,　　　　　　　　　　*

　　v.　　　　　　　　　　　　*　　Civil Action No. RDB-23-2371

MANUFACTURERS & TRADERS　　　　*
TRUST COMPANY,
　　　　　　　　　　　　　　*

　　　*Defendant*.

*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*　　*

**MEMORANDUM OPINION**

This matter arises from a banking dispute between Plaintiff South River Capital, LLC ("Plaintiff" or "South River Capital"), and its financial institution, Defendant Manufacturers & Traders Trust Company ("Defendant" or "M&T").  South River Capital, which provides loans to real estate developers and professional athletes, alleges that M&T failed to timely notify it that a large check deposited to its account had failed to clear, ultimately resulting in an overdraft.  *See* (ECF No. 51 ¶¶ 2, 4–34; ECF No. 40 ¶¶ 10–38.)  South River Capital initiated this action on September 1, 2023, by filing in this Court a three-Count Complaint against original defendant M&T Bank Corporation alleging violation of the Expedited Funds Availability Act, 12 U.S.C. § 4001 *et seq.* (Count I); violation of Maryland Commercial Code §§ 3-103 and 4-103 (Count II); and violation of Maryland Commercial Code § 4-124 (Count III).  (ECF No. 1.)  Thereafter, South River Capital filed a First Amended Complaint (ECF No. 11), which alleged the same claims but replaced M&T Bank Corporation with Defendant M&T, and then a Second Amended Complaint that amended Count II to a claim for breach of contract, *see* (ECF No. 22-1).  Finally, South River Capital filed the operative Third

Amended Complaint (ECF No. 40), in which it alleges against M&T only one claim for violation of Maryland Commercial Code § 4-214 (Count I).[1]  M&T then filed an Answer and Counterclaim in which it alleges a counterclaim for breach of contract (Count I) and money had and received (Count II).[2]  (ECF No. 41.)

Presently pending before this Court is M&T's Motion for Summary Judgment (ECF No. 42) ("M&T's Motion") as to its counterclaim for breach of contract.  Plaintiff has responded in Opposition (ECF No. 51), M&T has replied (ECF No. 60), and the parties have notified the Court that discovery is complete (ECF No. 55 at 1).  The parties' submissions have been reviewed, and no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2025).  For the reasons that follow, M&T's Motion for Summary Judgment (ECF No. 42) as to its counterclaim for breach of contract is GRANTED.

## BACKGROUND

The facts relevant to M&T's counterclaim for breach of contract are narrower than those South River Capital alleges as to its claim under Maryland Commercial Code § 4-214. For completeness, the Court provides the facts South River Capital has alleged before separately discussing the undisputed facts relevant to M&T's Motion for Summary Judgment as to Count I of its counterclaim.[3]

---

[1]  As explained further below, this Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332.

[2]  As detailed below, M&T does not clearly allege its breach of contract counterclaim under Maryland law in its Answer and Counterclaim, but it does allege its counterclaim for money had and received under Maryland law. (ECF No. 41 at 8–9.)

[3]  While the Court provides the general factual background below for clarity and completeness, some of the facts contained in the Plaintiff's one-Count Third Amended Complaint remain disputed.  For the purposes of adjudicating M&T's Motion, the Court relies solely on the undisputed facts relevant to M&T's Motion for Summary Judgment as to its counterclaim for breach of contract, *see infra* Background Section II.

## I.    General Factual Background

Plaintiff South River Capital has not sought summary judgment as to its sole claim against Defendant M&T, which the parties agree will proceed to a non-jury trial.  *See* (ECF No. 55 at 1).  At this pre-trial stage, therefore, the Court makes no factual findings regarding the facts alleged in Plaintiff's Third Amended Complaint except as to the undisputed facts discussed below in reference to Defendant's Motion for Summary Judgment as to its Counterclaim for breach of contract.  The below general background facts are provided for completeness and may be subject to dispute such that the Court makes no determination regarding their veracity.  *See In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 626 F. Supp. 3d 814, 837 (D. Md. 2022) ("In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (recognizing that only facts that "might affect the outcome of the suit under governing law" may be determinative as to summary judgment).

South River Capital opened an Advanced Business Checking Account ("Business Account") with M&T on January 23, 2017, in relation to its business of providing loans.  (ECF No. 51 ¶¶ 1–2; ECF No. 42 Ex. 2 at 2; ECF No. 42-1 ¶ 1; ECF No. 42 Ex. 1.)  South River Capital enters Participation Agreements, *see, e.g.* (ECF No. 51 Ex. 4), with various Participants who provide partial financing for such loans.  (ECF No. 51 ¶ 2.)  In July 2023, it received from one of its borrowers a check dated July 7, 2023 ("July 7 check"), in the amount of $622,597.00.  (*Id.* ¶¶ 4–5; ECF No. 51 Ex. 1.)  It deposited the July 7 check in its Business Account on July 11, 2023.  (ECF No. 51 ¶¶ 4–5; ECF No. 51 Ex. 2 at 5–6.)  At the time South River Capital

deposited the July 7 check, M&T did not provide notice that there were any conditions or holds on the check, and South River Capital's banks statements regarding the Business Account did not reflect that the deposit of the July 7 check was provisional. (ECF No. 51 ¶¶ 6, 7; ECF No. 51 Ex. 3.) Rather, the bank statements listed the July 7 check as a credit, and its amount was included in the running total of the Business Account's "daily balances." (ECF No. 51 ¶ 7; ECF No. 51 Ex. 3.)

Pursuant to its Participant Agreements, South River Capital was contractually obligated to disburse funds, including funds held in the Business Account, to Participants within a certain period. (ECF No. 51 ¶ 11; ECF No. 51 Ex. 4 at 4 ¶ 5(e).) After it deposited the July 7 check on July 11, 2023, its president, James Plack ("Mr. Plack"), contacted the Annapolis, Maryland, and Parole, Maryland branches of M&T via separate telephone calls to determine if the check had cleared. (ECF No. 51 ¶ 9.) In his deposition, Mr. Plack testified that he made these phone calls to ensure that he was transferring available funds that he could safely wire to the relevant Participant, and representatives[4] from both branches confirmed that the July 7 check had cleared. (*Id.* ¶ 10.) Although Mr. Plack was aware that there is a waiting period after a check is deposited, the M&T representatives did not disclose that the deposit was under a provisional credit. (*Id.*) Based on these phone calls and the online statements showing the credit in the amount of the July 7 check to its Business Account, South River Capital believed that the funds from the July 7 check had settled. (*Id.* ¶ 13.) Thus, it (1) disbursed funds from

---

[4] M&T represents that, between July 7, 2023, and September 1, 2023, M&T employees or representatives Jenny Mihailidis ("Ms. Mihailidis"), Senior Vice President of M&T's Washington, D.C. branch, and Imani Shaw, Esq, communicated with any employee or representative of South River Capital. (ECF No. 51 Ex. 2 at 5.) Relatedly, M&T provides that "Mr. Plack may have spoken with Jenny Mihailidis" regarding whether the July 7 check had cleared. (*Id.* at 7.)

its Business Account and the July 7 check deposited therein to a Participant; and (2) used funds from that account and deposit for operational purposes.[5]  (*Id.* ¶ 11; ECF No. 51 Ex. 3.)

Unbeknownst to South River Capital, M&T learned from its clearinghouse bank,[6] Fifth Third Bank, on July 12, 2023, that Fifth Third Bank rejected the July 7 check.  (ECF No. 51 ¶¶ 15–16; ECF No. 51 Ex. 5.)  An email from one M&T employee to seven other M&T employees stated that "we had a high dollar reject on [Fifth Third Bank] today" and included an attached "Partner IQA Reject Report" that listed, among others, the July 7 check as rejected.  (ECF No. 51 ¶ 16; ECF No. 51 Ex. 5.)  Fifth Third Bank deemed the July 7 check a "Non-Negotiable" item, debited M&T's clearinghouse account in the amount of the July 7 check, and returned the check to M&T by July 14, 2023, at the latest.  (ECF No. 51 ¶¶ 17–18; ECF No. 51 Ex. 6 at 5–7; ECF No. 51 Ex. 7 at 2.)  Specifically, Fifth Third Bank documents reflect that, on July 13, 2023, "[the July 7 check] was rejected due to invalid MICR data" and an adjustment was charged to M&T Bank.  (ECF No. 51 ¶ 19; ECF No. 51 Ex. 6 at 7.)  M&T forwarded the rejected check and adjustment from Fifth Third Bank to team members in its adjustment department who then "closed the adjustment."  (ECF No. 51 ¶ 24; ECF No. 51

---

[5]  Plaintiff states that "Mr. Plack was also an investor in the loan to Borrower and was also entitled to a disbursement from the July 7, 2023, check."  (ECF No. 51 ¶ 11.)  It is not clear from the filings before this Court whether funds were disbursed to Mr. Plack.

[6]  A clearinghouse bank facilitates movement of funds between banks.  As the Third Circuit has explained, Article 4 of the Uniform Commercial Code "provisionally assumes that when a check is deposited for payment, it will be paid by its drawer."  *NBT Bank, Nat'l Ass'n v. First Nat'l Cmty. Bank*, 393 F.3d 404, 407 n.3 (3d Cir. 2004); *see also* MD. CODE ANN., COM. LAW §§ 4-214(a), 4-215, 4-102 cmt. 1.  Thus, when a customer deposits a check, the depository bank places provisional funds for the value of the check in the customer's account. *NBT Bank, Nat'l Ass'n*, 393 F.3d at 407 n.3.  It then forwards the check to its clearinghouse bank.  *Id.*  If the clearinghouse bank accepts the check, it transfers the funds from the payor bank's clearinghouse account to the depository bank's clearinghouse account.  *Id.*  In this case, however, South River Capital asserts that the process went as follows: (1) it deposited the July 7 check; (2) M&T placed provisional funds for the amount of the July 7 check in South River Capital's Business Account; (3) M&T forwarded the July 7 check to its clearinghouse bank; but (4) the clearinghouse bank did not accept the check and instead returned it to M&T.

Ex. 2 at 5–6.) Those team member did not send the July 7 check to be processed, however, and M&T did not reconcile its ledger. (ECF No. 51 ¶ 24; ECF No. 51 Ex. 2 at 5–6.) As a result, M&T had a debit on its internal ledger for $622,587.00, the amount of the July 7 check, but failed to debit South River Capital's Business Account for that amount or to otherwise notify South River Capital of any issues with the check. (ECF No. 51 ¶¶ 20, 24–25.)

Nevertheless, the July 11, 2023, transaction in which South River Capital deposited the July 7 check was settled on July 14, 2023. (ECF No. 51 Ex. 7 at 5.) On July 17, 2023, Fifth Third Bank received an offset payment from M&T and the adjustment case was closed without further communication with M&T, which took no additional action regarding the July 7 check. (ECF No. 51 Ex. 6 at 7; ECF No. 51 ¶¶ 16, 19.) On August 10, 2023, M&T reviewed its ledger and discovered that the debit from the July 7 check remained outstanding. (*Id.* ¶ 26; ECF No. 51 Ex. 2 at 5–6.) Without providing any notice to Plaintiff, M&T presented the July 7 check a second time, and the check was returned a second time on August 16, 2023.[7] (ECF No. 51 ¶¶ 28, 29.)

During this period, South River Capital's Business Account continued to show a credit, and Plaintiff remained unaware of any issues with the July 7 check. (*Id.* ¶ 21.) South River Capital's bank statements reflect that, as of July 12, 2023, its daily balance was $1,823,800.83, which included a credit in the amount of the July 7 check. (*Id.* ¶ 23; ECF No. 51 Ex. 3.) Similarly, as of August 1, 2023, its bank statement reflected a daily balance of $1,404,811.40. (ECF No. 51 ¶ 23.) On August 14, 2023, South River Capital deposited a check dated August

---

[7] Records from Fifth Third Bank reflect that it never received the check a second time from M&T. (ECF No. 51 Ex. 7 at 7.)

7, 2023 ("August 7 check") in the amount of $622,597.00 to its Business Account with M&T. (ECF No. 51 ¶ 30; ECF No. 51 Ex. 8.) On August 16, 2023, the August 7 check was returned to M&T for non-sufficient funds. (ECF No. 51 ¶ 31; ECF No. 51 Ex. 8.)

## II.    Facts Relevant to M&T's Motion for Summary Judgment as to its Counterclaim for Breach of Contract

As noted above, South River Capital opened its Business Account at M&T on January 23, 2017. (ECF No. 51 ¶¶ 1–2; ECF No. 42 Ex. 2 at 2; ECF No. 42-1 ¶ 1; ECF No. 42 Ex. 1.) To open the Business Account, Mr. Plack executed on behalf of South River Capital a Signature Card on January 23, 2017. (ECF No. 42 Ex. 1 at 2 ¶ 5; Ex. 42 Ex. 2.) That Signature Card states: "With respect to the [Business] Account, the above-named Depositor: (1) acknowledges receipt of, and agrees to all provisions of, M&T Bank's Commercial Deposit Account Agreement [CDAA] . . . and all related agreements . . . all as amended from time to time . . . ." (Ex. 42 Ex. 2 at 2.) M&T asserts that during the period discussed above, the Business Account was governed by its Commercial Deposit Account Agreement ("CDAA") in effect as of August 1, 2023, (ECF No. 42 Ex. 3). *See* (ECF No. 42 Ex. 1 at 3 ¶ 6.) Plaintiff states that it did not receive or sign the CDAA. (ECF No. 51 at 10.)

The CDAA is part of the broader Agreement between M&T and each Client, which the CDAA defines as "the agreement between M&T and Client relating to each Account, consisting of and incorporating this CDAA and all forms and agreements related to the opening, maintenance, closing, or any other aspect of an Account, including set-up forms, resolutions, specific features and terms, availability disclosures, Service Fee schedules, and agreements for ancillary Account services." (ECF No. 42 Ex. 3 at 15.) The CDAA defines an "Account" as "each deposit account opened or maintained for Client at M&T for purposes

other than personal, family, or household." (*Id.*)  It defines "Client" as "the person on behalf of which an Account is opened or maintained and all authorized agents of such person." (*Id.*)  Under the CDAA, "[b]y opening or using an Account, Client agrees to be bound by the Agreement." (*Id.* at 4.)  The CDAA includes a provision that it is governed and interpreted according to federal law and, subject to preemption, New York law, without regard to New York's conflicts of law principles. (*Id.* at 12 § 31.)

Section 15 of the CDAA provides, in relevant part, that "M&T may charge Service Fees related to any Debit Transaction exceeding the Available Balance and Client must immediately pay M&T the amount of the overdraft … and any other Amounts Due." (ECF No. 42-1 at 3 (quoting (ECF No. 42 Ex. 3 at 7 § 15)).)  Pursuant to the CDAA, "Amounts Due" includes "all amounts Client owes to M&T, including: (i) Service Fees; (ii) the principal amount of overdrafts; (iii) the amount of any returned or reversed Credit Transaction; and (iv) any expenses M&T incurs in connection with (1) collecting funds, (2) cashing Items, (3) returned Transactions, and (4) any claim against M&T with respect to the Transaction." (*Id.* at 3 n.2 (quoting (ECF No. 42-1 Ex. 3 at 14)).)  Section 24(b) of the CDAA provides:

> Client will timely pay M&T all Amounts Due, including Service Fees. M&T may charge an Account, without prior Notice, for all Amounts Due, and is not liable if, as a result, the Available Balance is insufficient to pay Debit Transactions. … Client is responsible for paying Amounts Due even if M&T does not, or cannot, debit the Account for such amounts.

(*Id.* at 3 (quoting (ECF No. 42 Ex. 3 at 10–11 § 24(b))).)

As detailed above, Plaintiff deposited the July 7 check for $622,597.00 in its Business Account on July 11, 2023. (ECF No. 51 ¶¶ 4–5; ECF No. 51 Ex. 2 at 5–6.)  M&T did not provide South River Capital any notice that the July 7 check had been rejected by its

clearinghouse bank, and South River Capital's bank statements reflected a positive account balance until August 16, 2023.  (ECF No. 51 Ex. 3.)  On August 14, 2023, South River Capital deposited to its Business Account the August 7 check in the amount of $622,597.00.  (ECF No. 51 ¶ 30; ECF No. 51 Ex. 8.)  On August 16, 2023, the August 7 check was returned to M&T for non-sufficient funds.  (ECF No. 51 Ex. 8.)

Accordingly, on August 16, 2023, M&T returned both the July 7 and the August 7 checks—totaling $1,245,194.00—to South River Capital.  (ECF No. 42 Ex. 4 at 1; ECF No. 42 Ex. 1 at 3 ¶ 6.)  The same day, M&T debited South River Capital's Business Account for the total amount of the returned checks.  (ECF No. 51 ¶ 32; ECF No. 51 Ex. 3; ECF No. 42-1 ¶¶ 3, 4; ECF No. 42 Ex. 1 ¶¶ 7, 8; ECF No. 42 Ex. 4; ECF No. 42 Ex. 5 *SEALED*.)  These simultaneous debits resulted in South River Capital's Business Account having a negative balance—or overdraft—in the amount of $188,351.00 as of August 16, 2023, and $188,423.13 as of August 18, 2023.[8]  (ECF No. 51 ¶ 33; ECF No. 51 Ex. 3; ECF No. 42-1 ¶ 5; ECF No. 42 Ex. 1 ¶ 9; ECF No. 42 Ex. 5 *SEALED*.)  To date, South River Capital has not deposited additional funds to return the Business Account to a positive balance, has not paid the overdrawn amount of $188,423.13, and has generally stopped using the Business Account.  (ECF No. 42-1 ¶ 6; ECF No. 42 Ex. 1 at 3 ¶ 10; ECF No. 42 Ex. 5 *SEALED*.)

### III.    Procedural History

South River Capital initiated this action on September 1, 2023, by filing in this Court a three-Count Complaint against M&T Bank Corporation.  (ECF No. 1.)  On September 19,

---

[8] Plaintiff asserts that the overdraw amount was $188,351.00 as of August 16, 2023, and Defendant asserts the overdraw amount was $188,423.13 as of August 18, 2023.  *Compare* (ECF No. 51 ¶ 33 (citing ECF No. 51 Ex. 3)) *with* (ECF No. 42-1 ¶ 5 (citing (ECF No. 42 Ex. 1; ECF No. 42 Ex. 5 *SEALED*)).

2023, South River Capital filed a First Amended Complaint (ECF No. 4), in which it alleged the same claims but replaced M&T Bank Corporation with Defendant. M&T filed a Motion to Dismiss (ECF No. 7), and Plaintiff requested leave to file a Second Amended Complaint, *see* (ECF No. 11). By Memorandum Order dated July 24, 2024, (ECF No. 19) this Court denied M&T's Motion to Dismiss and granted leave to amend. Plaintiff then filed its Second Amended Complaint (ECF No. 22), alleging against M&T violation of the federal Expedited Funds Availability Act, 12 U.S.C. § 4001 *et seq.* (Count I); breach of contract for failure to exercise ordinary care and good faith (Count II); and violation of Maryland Commercial Code § 4-214 (Count III). (ECF No. 22 at 5–9.)

On February 24, 2025, South River Capital filed the operative Third Amended Complaint, which alleges against Defendant only one claim for violation of Maryland Commercial Code § 4-214 (Count I). (ECF No. 40 at 5.) On March 3, 2025, Defendant filed an Answer and Counterclaim (ECF No. 41) in which it alleges a counterclaim of breach of contract (Count I) and money had and received (Count II). (*Id.* at 8–9.) Also on March 3, 2025, Defendant filed a Motion for Summary Judgment (ECF No. 42) as to its counterclaim for breach of contract. South River Capital filed its Response in Opposition (ECF No. 51), and M&T has replied (ECF No. 60). On April 8, 2025, the parties notified this Court that discovery in this matter was complete. (ECF No. 55.) This matter is now ripe for review.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A

material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation ... to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656–59 (2014).

To survive summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). That is, the nonmoving party bears the burden

11

to submit evidence that is "significantly probative" as to a genuine issue of material fact. *Anderson*, 477 U.S. at 249–50.

## ANALYSIS

### I.    Jurisdiction

As an initial matter, the Court clarifies its jurisdiction of this case.  Although the Third Amended Complaint asserts both federal question jurisdiction based on the Expedited Funds Availability Act, 12 U.S.C. § 4001 *et seq.*, and diversity jurisdiction, this Court lacks federal question jurisdiction.  South River Capital alleges no claims under the Expedited Funds Availability Act because its sole claim asserts that M&T violated its statutory duties under Section 4-214 of Maryland's Commercial Code.  That is, South River Capital's sole claim arises under state law, not federal law.[9]  Accordingly, the only remaining basis for jurisdiction is 28 U.S.C. § 1332, which provides federal courts "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, and" the dispute arises between citizens of different states.  28 U.S.C. § 1332(a)(1).  The amount-in-controversy requirement is evaluated at the time the action is filed such that "the allegations of the complaint, which were made apparently in good faith, will control, and subsequent events that reduce the amount of recovery will not deprive the Court of jurisdiction."  *Morris v. Naugle*, 722 F. Supp. 1285, 1287 (D. Md. 1989).

---

[9]  The Expedited Funds Availability Act governs, in part, the time in which a bank must make funds available to a customer, while Plaintiff in this case alleges violations of ordinary care and good faith for failure to timely notify that provisional funds already made available would be charged back due to insufficient funds from the payor of the check.  *See Essex Constr. Corp. v. Indus. Bank of Wash., Inc.*, 913 F. Supp. 416, 417–18 (D. Md. 1995) (discussing Expedited Funds Availability Act); (ECF No. 40 at 5 (alleging claim under Maryland Commercial Code § 4-214)).

In this case, it is undisputed that Plaintiff is a citizen of Maryland and Defendant is a citizen of New York for the purposes of jurisdiction.[10]  *See* (ECF No. 40 ¶ 2; ECF No. 41 ¶ 3.)  In the Third Amended Complaint, Plaintiff alleges damages of either the amount of the July 7 check, $622,597.00, or, alternatively, in the amount of $190,712.  (ECF No. 40 ¶ 38, at 6–7.)  Plaintiff alleges such amounts in controversy based on its claim that M&T is liable under Maryland Commercial Code Section 4-214 for breaches of ordinary care and good faith.  Although M&T now asserts that, under Maryland Commercial Code Section 4-103(e) Plaintiff's damages could *only* ever amount to $1,019.20, Plaintiff's good faith allegation of damages controls such that this Court maintains jurisdiction under 28 U.S.C. § 1332.  *See* (ECF No. 61 at 6–7); *see also* MD. CODE ANN., COM. LAW § 4-103(e) ("The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care.  If there is bad faith it includes any other damages the party suffered as a proximate consequence.").

## II.    Summary Judgment as to M&T's counterclaim for breach of contract

M&T seeks summary judgment as to Count I of its counterclaim because the Commercial Deposit Account Agreement ("CDAA") governs the relevant Business Account, South River Capital breached the CDAA by failing to maintain sufficient funds in its Business Account, and M&T suffered damages because of South River Capital's breach.  (ECF No. 42-

---

[10]  For jurisdictional purposes, a limited liability company is considered a citizen of each state of which its members are citizens, and a corporation is a citizen of both its principal place of business and its state of incorporation.  *Haak Motors, LLC v. Arangio*, 670 F. Supp. 2d 430, 432 n.1 (D. Md. 2009).  In this case, the parties represent that South River Capital's members are its President, Mr. Plack, and his wife, both of whom are citizens of Maryland. *See* (ECF No. 51 Ex. 12 at 5:17–6:12, 11:9–17; ECF No. 42 Ex. 3 at 4.)  M&T is a citizen of New York, where it is incorporated and has its principal place of business.  (ECF No. 41 ¶ 3.)

1 at 1.)  Before addressing the parties' legal arguments, the Court determines whether there

exists any genuine dispute of material fact as to M&T's counterclaim for breach of contract.

### A.    No Genuine Dispute of Material Fact as to M&T's Counterclaim for Breach of Contract

Under Federal Rule of Civil Procedure 56(c), a party seeking summary judgment bears

the burden to "cit[e] to particular parts of materials in the record" to support its arguments

that no material fact is subject to genuine dispute.  FED. R. CIV. P. 56(c)(1)(A), (B).  Once a

moving party has met this burden, the nonmoving party must identify the disputed, material

fact or facts by citing to particular facts in the record.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"[A] party opposing a properly supported motion for summary judgment may not rest upon

the mere allegations or denials of his pleading, but must set forth specific facts showing that

there is a genuine issue for trial."  *Interprofession du Gruyere v. U.S. Dairy Exp. Council*, 61 F.4th

407, 415 (4th Cir. 2023) (alteration in original) (quoting *Anderson*, 477 U.S. at 248).

In this case, it is undisputed that the CDAA governs the Business Account.  M&T has

provided a copy of the CDAA in effect as of August 1, 2023, which defines an "Account" as

"each deposit account opened or maintained for Client at M&T for purposes other than

personal, family, or household."  (ECF No. 42 Ex. 3 at 15.)  As explained above, the CDAA

is part of the Agreement between M&T and each Client, including South River Capital.  *See*

(*id.* at 15).  Under the CDAA, "[b]y opening *or using an Account*, Client agrees to be bound by

the Agreement."  (*Id.* at 4 § 2(a) (emphasis added).)  M&T attaches to its Motion for Summary

Judgment an affidavit from its Senior Vice President for Consumer Operations & Risk Market

Manager, Robert Newton, III, in which he avers that South River Capital's sole member, Mr.

Plack, executed a Signature Card to open South River Capital's Business Account on January

23, 2017.  (ECF No. 42 Ex. 1 at 2 ¶ 5.)  As explained above, that Signature Card provides: "With respect to the [Business] Account, the above-named Depositor: (1) acknowledges receipt of, and agrees to all provisions of, M&T Bank's Commercial Deposit Account Agreement [CDAA] . . . and all related agreements . . . all as amended from time to time . . . ." (ECF No. 42 Ex. 2 at 2.)  Accordingly, M&T has met its burden to "[c]ite particular parts of materials in the record" and establish that there exists no genuine dispute of material fact. FED. R. CIV. P. 56(c)(1)(A), (B); *Scott*, 550 U.S. at 378.

Although Plaintiff argues in Opposition that it "opened its account with M&T on January 23, 2017 and did not receive or sign the 2020 CDAA," it does not dispute the terms of the Agreement, including the provision of the CDAA that "by . . . using an Account, Client agrees to be bound by the Agreement."  (ECF No. 42 Ex. 3 at 4; ECF No. 51 at 10.)  Nor does South River Capital dispute that Mr. Plack signed the Signature Card containing the express acknowledgement of receipt of and agreement to the terms of the CDAA "as amended from time to time."  (ECF No. 42 Ex. 2 at 2.)  Indeed, Plaintiff admits numerous times that it used the Business Account by depositing the July 7 check, withdrawing funds from the Business Account, and depositing the August 7 check.  *See, e.g.* (ECF No. 51 ¶¶ 2–9, 23–30.) Additionally, Plaintiff acknowledges that the CDAA states that New York law applies and cites to both New York and Maryland law in its Opposition.  (ECF No. 51 at 10 n.3.)

Thus, Plaintiff has not identified specific evidence in the record that would establish a genuine dispute as to (1) whether the CDAA governs the Business Account, or (2) the terms of the CDAA.  *See Interprofession du Gruyere*, 61 F.4th at 415 ("[A] party opposing a properly supported motion for summary judgment . . . must set forth specific facts showing that there

is a genuine issue for trial." (quoting *Anderson*, 477 U.S. at 248)); *In re ABF Freight Sys., Inc. v. Lab. Cont. Litig.*, 988 F. Supp. 556, 568 (D. Md. 1997) ("A party opposing a motion for summary judgment is not entitled to create a dispute of material fact 'through mere speculation or the building of one inference upon another.'" (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985))).  Accordingly, even viewing the evidence in the light most favorable to South River Capital, there exists no genuine dispute that (1) the CDAA governed the Business Account as of August 1, 2023; (2) South River Capital agreed to the CDAA; and (3) the terms of the CDAA are reflected in the exhibit submitted by M&T Bank.

Relatedly, there exists no genuine dispute as to the amount of the negative balance on the Business Account or as to M&T's entitlement to attorneys' fees under the CDAA.  First, as to the overdraft amount, M&T provides a statement of account activity for the Business Account that shows that the most recent account activity occurred on August 18, 2023, when the Business Account contained a negative balance of $188,423.13.  (ECF No. 42 Ex. 5 *SEALED* at 3.)    Although South River Capital refers to the overdraft amount as $188,351.00, it provides the same Business Account statement for the period between August 1, 2023, and August 31, 2023, which reflects a negative balance of $188,423.13 as of August 18, 2023.  *Compare* (ECF No. 42 Ex. 5 *SEALED* at 3) *and* (ECF No. 51 Ex. 3 at 3) (both reflecting identical negative balance on August 16, 2023, and August 18, 2023).  Second, as to attorneys' fees pursuant to the CDAA, Section 24(b) of the CDAA states: "Client will pay, upon demand, costs incurred by M&T in collecting Amounts Due or enforcing the Agreement, including attorneys' fees and disbursements."  (ECF No. 42 Ex. 3 at 10 § 24(b).)

South River Capital does not respond to this portion of M&T's Motion and, therefore, fails to raise any genuine dispute of material fact that would overcome M&T's record evidence.

**B.    Judgment as a Matter of Law as to Counterclaim**

Under these undisputed facts, M&T is entitled to judgment as a matter of law as to its counterclaim for breach of contract.  In its Motion, M&T contends that it is entitled to summary judgment because: "(1) the CDAA is a binding and enforceable agreement between M&T and [South River Capital]; (2) [South River Capital] breached the CDAA by failing to maintain sufficient funds in its account to pay for charges made on its account; and (3) M&T has suffered damages [in the amount of $188,423.13] as a direct and proximate result of [South River Capital's] breach."  (ECF No. 42-1 at 3.)  Specifically, M&T asserts that South River Capital has breached its contractual obligations to immediately pay M&T the amount of the overdraft and to "timely pay M&T all Amounts Due, including Service Fees" under Sections 15 and 24(b) of the CDAA.  (*Id.*; ECF No. 42 Ex. 3 at 7 § 15, 10 § 24(b).)  In Opposition, South River Capital contends that M&T is not entitled to summary judgment because its failure to comport with its duty of ordinary care under Article 4 of Maryland's Commercial Code and its delay in providing notice that the July 7 check had been rejected and returned preclude its right to recover the overdraft.  *See generally* (ECF No. 51 at 10–18).  Separately, South River Capital argues that summary judgment is inappropriate because M&T's counterclaim is barred by equitable estoppel and, relatedly, M&T's bad faith.  (*Id.* at 18–22.)  As explained further below, M&T is entitled to summary judgment.

i.       **Choice of Law**

As an initial matter, although the CDAA states that it is governed and interpreted under federal and New York law, (ECF No. 42 Ex. 3 at 12 § 31), the parties do not address whether M&T's counterclaim for breach of contract arises under Maryland or New York law.  Without discussing choice of law, M&T appears to bring its counterclaim under Maryland law.  *See* (ECF No. 42-1 (offering elements of breach of contract as elucidated under Maryland law in *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001)).  South River Capital notes that "[t]he CDAA states that New York law applies[,]" but concludes that the New York Uniform Commercial Code and the Maryland Uniform Commercial Code "are the same with respect to the applicable code sections at issue here."  (ECF No. 51 at 10 n.3.)  Accordingly, South River Capital "cites to both New York and Maryland cases."  (*Id.*)  It does not raise or discuss differences or similarities between New York and Maryland law of contracts.

"A federal court sitting in diversity must apply the choice-of-law rules from the forum state." *Montage Furniture Servs., LLC v. Regency Furniture, Inc.*, 966 F. Supp. 2d 519, 523 (D. Md. 2013) (quoting *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999)).  In Maryland, "the law of the jurisdiction where the contract was made controls its validity and construction."  *Id.* (quoting *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013)).  Nevertheless, "it is generally accepted that the parties to a contract may agree as to the law which will govern their transaction . . . ." *Three M Enters., Inc. v. Tex. D.A.R. Enters., Inc.*, 368 F. Supp. 2d 450, 457 (D. Md. 2005) (quoting *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 650 A.2d 246, 248 (Md. 1994)); *accord Balt. Scrap Corp. v. RLI Ins. Co.*, 493 F. Supp. 3d 433, 445 (D. Md. 2020).  Where, as here, the parties assume that the law of one state applies without briefing the issue, however, a Court

need not raise it *sua sponte*.[11]  *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 781 (4th Cir.

2023) ("[W]e reaffirm our conclusion . . . that choice of law is not jurisdictional.  A party

abandons any claim that a different state's law should govern the action if it fails to raise that

issue before or during trial."); *see also id.* at 779–80 (collecting cases); *Balt. Scrap Corp.*, 493 F.

Supp. 3d at 445 (applying Maryland law because "the parties seem to assume that Maryland

law applies, without discussion").  Accordingly, the parties have waived any dispute as to

choice of law and, like the parties, the Court addresses M&T's counterclaim under Maryland

law.

### ii.    Count I of Counterclaim: Breach of Contract

Under Maryland law, "[t]o prevail in an action for breach of contract, a plaintiff must

prove that the defendant owed the plaintiff a contractual obligation and that the defendant

breached that obligation."  *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001); *accord*

*Level Heating & Air Conditioning Co. v. Patriot Constr., LLC*, Civ. No. DLB-20-3154, 2021 WL

5804297, at *4 (D. Md. Dec. 7, 2021); *MCG, Inc. v. MGSJ Holdings, Inc.*, 648 F. App'x 372, 374

(4th Cir. 2016) (unpublished).  In the context of banking agreements, Maryland's highest court

has affirmed judgment to banks based on their contractual right under signature cards and

account agreements to debit customers' accounts to recover funds from bad checks.  *See, e.g.*,

---

[11] This Court has recognized that "[t]he essential elements of breach of contract" in Maryland and New York "are broadly similar."  *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 341 F.R.D. 128, 156 (D. Md. 2022). "Under Maryland law, '[t]he elements of a claim for breach of contract include 'contractual obligation, breach, and damages.'"  *Id.* (alteration in original) (quoting *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015)).  "Under New York law, 'the elements of a breach of contract claim are (1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) resulting damages.'"  *Id.* (quoting *Alloy Advisory, LLC v. 503 W. 33rd St. Assoc., Inc.*, 144 N.Y.S.3d 854, 854 (N.Y. App. Div. 2021) (Mem.)).  Like the parties, however, this Court addresses M&T's counterclaim for breach of contract under Maryland law only because the parties have waived any choice of law issue as to the counterclaim.

*Lema v. Bank of Am., N.A.*, 826 A.2d 504, 516–17 (Md. 2003) (affirming that bank "was entitled to debit [customer's] account" based in part on theory that customer breached banking agreement by allowing counterfeit checks to pass through his account). As explained below, M&T has established its entitlement to judgment as a matter of law as to its counterclaim for breach of contract.

M&T argues that two provisions of the CDAA establish that South River Capital had a contractual obligation to repay overdrafts. (ECF No. 42-1 at 3.) First, it argues that Section 15 of the CDAA provides, in relevant part, "M&T may charge Service Fees related to any Debit Transaction exceeding the Available Balance and Client must immediately pay M&T the amount of the overdraft … and any other Amounts Due." (ECF No. 42-1 at 3 (quoting (ECF No. 42 Ex. 3 at 7 § 15)).) Pursuant to the CDAA, "Amounts Due" includes "all amounts Client owes to M&T, including: (i) Service Fees; (ii) the principal amount of overdrafts; (iii) the amount of any returned or reversed Credit Transaction; and (iv) any expenses M&T incurs in connection with (1) collecting funds, (2) cashing Items, (3) returned Transactions, and (4) any claim against M&T with respect to the Transaction." (*Id.* at 3 n.2 (quoting (ECF No. 42 Ex. 3 at 14)).)

Second, it argues that Section 24(b) of the CDAA provides:

> Client will timely pay M&T all Amounts Due, including Service Fees. M&T may charge an Account, without prior Notice, for all Amounts Due, and is not liable if, as a result, the Available Balance is insufficient to pay Debit Transactions. … Client is responsible for paying Amounts Due even if M&T does not, or cannot, debit the Account for such amounts.

(*Id.* at 3 (quoting (ECF No. 42 Ex. 3 at 10 § 24(b)).) M&T contends that South River Capital breached these contractual provisions and caused it to incur damages in the amount of

$188,423.13.  (*Id.*)  Relatedly, it argues that it is entitled to attorneys' fees under the CDAA and to prejudgment interest as of right.  (*Id.* at 4.)

In Opposition, South River Capital argues that under the Uniform Commercial Code ("UCC") as adopted in both Maryland and New York, "a bank cannot disclaim by contract with its customer the bank's responsibility for lack of good faith or failure to exercise ordinary care or limit the measure of damages for such failure."  (ECF No. 51 at 10 & n.3 (citing UCC Section 4-103(a)).)  South River Capital contends that the UCC precludes summary judgment as to M&T's counterclaim for breach of contract because M&T failed to "exercise[] ordinary care" and acted in "bad faith with respect to its handling of [South River Capital's] July 11, 2023 deposit[.]"  (*Id.* at 10.)  Relatedly, South River Capital argues that M&T's counterclaim for breach of contract is barred by estoppel.  (*Id.* at 11.)  In short, South River Capital contends that M&T's alleged failure to comport with the UCC, as adopted in Maryland, precludes it from recovering damages for any breach of contract.

M&T has established that South River Capital breached its obligation under the CDAA undisputedly governing the Business Account.  Specifically, South River Capital was obligated to "immediately pay M&T the amount of the overdraft (unless the overdraft is fully covered by an Overdraft Arrangement) and any other Amounts Due" and to pay "Amounts Due even if M&T does not, or cannot, debit the Account for such amounts."  (ECF No. 42 Ex. 3 at 8 § 15, 10 § 14(b).)  M&T has proven that South River Capital breached that obligation by providing financial statements demonstrating that South River Capital's account was overdrawn in by $188,351.08 on August 16, 2023, and by $188,423.13 on August 18, 2023. (ECF No. 43 Ex. 5 *SEALED* at 1–2.)  South River Capital does not dispute the amount of

the negative balance on either date.  (ECF No. 51 ¶ 33; ECF No. 51 Ex. 3 at 3.)  Similarly, South River Capital does not dispute that it has failed to repay the amount of the overdraft. (*Id.* at 10–18.)  Accordingly, M&T has established that (1) the terms of the CDAA required South River Capital to immediately repay the amount of the overdraft; (2) South River Capital has failed to meet its repayment obligation; and (3) it suffered damages in the amount of $188,423.13 as a result of CDAA's failure to immediately repay the negative balance.  Absent applicable defenses, therefore, M&T has met its burden to demonstrate entitlement to judgment as a matter of law as to Count I of its counterclaim.

### iii.  UCC Article 4 is not a Defense to M&T's Counterclaim

Despite South River Capital's arguments, Article 4 of Maryland's Commercial Code[12] does not affect M&T's ability to raise a breach of contract counterclaim.  South River Capital argues that, by statute, a bank cannot contractually disclaim its duties of good faith and ordinary care, including its duty to limit the measure of damages resulting from any breach of those duties.  (ECF No. 51 at 10 (collecting cases).)  South River Capital argues that M&T breached its duty of good faith and ordinary care by failing to timely notify it that the July 7 check had not cleared and, therefore, M&T is not permitted to recover the amount of the overdraft.  (*Id.*)  It asserts that Section 4-202 of Maryland's Commercial Code imposes obligations on banks regarding: (1) presenting or sending an item for presentment; (2) sending notice of dishonor or nonpayment or returning an item after learning that it has not been paid or accepted; and (3) notifying the transferor of any loss or delay in transit within a reasonable

---

[12] Article 4 of Maryland's Commercial Code largely adopts the Article 4 of the Uniform Commercial Code, and Plaintiff cites to both through its briefing.  *See, e.g.,* (ECF No. 51 at 10, 11).

time.  (*Id.* at 11 (citing MD. CODE ANN., COM. LAW § 4-202(a).)  South River Capital contends

that M&T breached its duty under Section 4-202 by failing to meet its "midnight deadline"[13]

to act as to the July 7 check.  (*Id.*)  Relatedly, it argues that M&T lost its right to recover the

funds from the July 7 check under Maryland Commercial Code Section 4-214, which allows a

customer to hold a bank liable for damages proximately caused by the bank's failure to timely

discharge its duties.  (*Id.* at 13–14 (collecting cases); at 14 (citing UCC § 4-214(a)).)

Resolution of whether M&T breached its duties under Article 4 of Maryland's

Commercial Code has no bearing on M&T's counterclaim for breach of contract.  Section 4-

202 of Maryland's Commercial Code merely provides the circumstances in which a bank must

exercise ordinary care, describes when a collecting bank has exercised such care, and limits a

bank's liability for loss or destruction of an item under certain conditions.  *See* MD. CODE

ANN., COM. LAW § 4-202(a)–(c).  Plaintiff cites no cases, and this Court is not aware of any

cases, in which courts have interpreted this provision of the Uniform Commercial Code to

preclude a bank's contractual right to recover provisional funds after a check is returned.  The

statutory duties in Section 4-202 could theoretically give rise to claims for negligence,[14] but the

*bank's* statutory duties under this Section have no effect on *Plaintiff's* contractual duty to repay

overdrafts.  Rather, Section 4-202 would apply in relation to any claim that M&T in this case

violated its statutory duty of ordinary care.

---

[13]  Under Maryland Commercial Code Section 4-104(a)(10), a bank's "midnight deadline" "is midnight on the
next banking day following the banking day on which it receives the relevant item or notice or from which the
time for taking action commences to run, whichever is later[.]"

[14]  The Court notes, however, that Maryland authorizes parties to alter standards of ordinary care by contract.
*See, e.g., Novara v. Mfrs. & Traders Tr. Co.*, Civ. No. ELH-11-736, 2011 WL 3841538, at *7 (D. Md. Aug. 26,
2011) (discussing § 4-202 in the context of a negligence claim and noting that the Section 4-103 of Maryland's
Commercial Code authorizes parties to alter standards of ordinary care by contract).

Nor does Section 4-214 of Maryland's Commercial Code affect M&T's contractual right to recover an overdraft. Section 4-214(a) provides:

> If a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge-back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. *If the return or notice is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge-back the credit, or obtain refund from its customer, but it is liable for any loss resulting from the delay.* These rights to revoke, charge-back, and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final.

MD. CODE ANN., COM. LAW § 4-214(a) (emphasis added). Plaintiff argues that, under this provision, M&T is liable at minimum "for any loss resulting from [its] delay" in notifying Plaintiff that the July 7 check had been rejected. (ECF No. 51 at 16–17.) M&T's liability for damages under its statutory obligations pursuant to Section 4-214(a), however, is not at issue in its counterclaim for breach of contract.

Indeed, Editor's Note 3 to the Uniform Commercial Code Comment included with Section 4-214 of Maryland's Commercial Code clarifies that "[t]he second sentence of subsection (a) adopts the view of *Appliance Buyers Credit Corp. v. Prospect National Bank*, 708 F.2d 290 (7th Cir. 1983), that if the midnight deadline for returning an item or giving notice is not met, a collecting bank loses its rights *only to the extent of damages for any loss resulting from the delay*." In *Appliance Buyers Credit*, the Seventh Circuit considered the right to chargeback an account for a returned check where the banking institution failed to provide reasonable or midnight

notice under Section 4-214.[15] 708 F.2d at 292–95. That is, the Seventh Circuit did not consider a breach of contract claim but rather the extent of damages arising from untimely notice in violation of a bank's obligations under Section 4-214 of the Uniform Commercial Code. As applied to this case, Section 4-214 is relevant to Plaintiff's claim against M&T, but it is not relevant to Defendant's counterclaim for breach of contract. As M&T notes, the fact that the parties may ultimately exchange damages on their claim and counterclaim does not preclude resolution of the counterclaim at summary judgment. (ECF No. 61 n.4 (first citing FED. R. CIV. P. 54(b); then citing *Electroglas, Inc. v. Dynatex Corp.*, 473 F. Supp. 1167, 1171 (N.D. Cal. 1979); and then citing *Coakley Landfill Grp. v. IT Corp.*, 116 F. Supp. 2d 237, 241 (D.N.H. 2000)).); *see also Lifespan Corp. v. New Eng. Med. Ctr., Inc.*, 2008 WL 310967, at *2 (D.R.I. Feb. 1, 2008) (collecting cases); *Chemetron Corp. v. Cervantes*, 92 F.R.D. 26, 30 (D.P.R. 1981). Accordingly, Plaintiff's arguments regarding Article 4 of Maryland's Commercial Code do not affect Defendant's entitlement to summary judgment as to its counterclaim for breach of contract.

### iv.    Estoppel Does not Bar M&T's Counterclaim

Nor does equitable estoppel prevent M&T from recovering for breach of contract in this case. [16] Under Maryland law, equitable estoppel is a defense to breach of contract and may apply where the asserting party was "misled to his [or her] injury and . . . changed his [or

---

[15] Although the Seventh Circuit references Section 4-212 of the Uniform Commercial Code, Maryland has codified that section at Maryland Commercial Code Section 4-214.

[16] South River Capital also references a defense of unclean hands, but it provides no legal argument to support that defense. (ECF No. 51 at 18–19.) The party raising an affirmative defense of unclean hands bears the burden to prove that the defense applies. *See CapitalSource Fin., LLC v. Delco Oil, Inc.*, 608 F. Supp. 2d 655, 664 n.4 (D. Md. 2009). By providing no argument as to unclean hands, South River Capital has failed to meet its burden.

her] position for the worse, having believed and relied on the representations of the party sought to be estopped." *Dickerson v. Longoria*, 995 A.2d 721, 743 (Md. 2010) (quoting *Creveling v. GEICO*, 828 A.2d 229, 246 (Md. 2003)).  Generally, the elements of equitable estoppel in Maryland include "(1) voluntary conduct or a representation by the party to be estopped, even if there is no intent to mislead; (2) reliance by the estopping party; (3) and detriment to the estopping party." *Cath. Univ. of Am. v. Bragunier Masonry Contractors, Inc.*, 775 A.2d 458, 474 (Md. 2001) (quoting *Holzman v. Fiola Blum, Inc.*, 726 A.2d 818, 832 (Md. Ct. Spec. App. 1999)). Importantly, to succeed on an equitable estoppel defense, the party asserting the defense must show that it suffered a detriment.  *Creveling*, 828 A.2d at 247 (quoting *Cunninghame v. Cunninghame*, 772 A.2d 1188, 1202 (Md. 2001)).

In this case, South River Capital argues that that the overdraft only occurred because M&T failed to reasonably and timely notify it that the July 7 check had not cleared. (ECF No. 51 at 17–18.)  Moreover, it contends that it would not have made a payment of $413,870.11 from the Business Account if it had been timely informed that the July 7 check was provisional, that there was an issue with the check, or that the check had not cleared.  (*Id.* at 18 n.10.) Similarly, Plaintiff argues that it relied on the representations of M&T employees via telephone that the check had cleared.  (*Id.* ¶¶ 9–11.)  In opposition, M&T argues that estoppel defenses cannot overcome its statutory right to chargeback an overdraft and South River Capital has failed to show that it was subjected to any detriment due to M&T's alleged failure to exercise ordinary care and provide timely notice.[17]  (ECF No. 60 at 9–10.)

---

[17]  To the extent M&T Bank raises arguments regarding estoppel and its statutory right to chargeback an account, those arguments are not applicable to its counterclaim for breach of contract.  (ECF No. 60 at 9–10 (collecting cases).)  That is, M&T has already charged back the Business Account at issue, which resulted in the

To the extent M&T seeks recovery of the amount of the overdraft itself, South River Capital has not met its burden to demonstrate that it was misled *to its detriment*. To show a detriment, a party must show that its position changed "for the worse." *Dickerson*, 995 A.2d at 743 (quoting *Creveling*, 828 A.2d at 246). In this case, because the payor never had sufficient funds to cover the check, South River Capital, as the payee, would *always* have been in the position that it did not receive funds it was owed. The fact of the overdraft itself—that is the $188,423.13—does not indicate that South River Capital has suffered a detriment. It merely indicates the party who currently bears the outstanding cost of the returned July 7 check. Put differently, at present, M&T bears the outstanding cost of the July 7 check because South River Capital possesses $188,423.13 of M&T's funds, which M&T made provisionally available when the July 7 check was deposited. Once South River Capital repays the $188,423.13, South River Capital will bear the outstanding cost of the July 7 check, as it would have originally if its Business Account had held enough funds to allow M&T to debit the full amount of the July 7 check. Even if South River Capital had received earlier notice, it still would not have been entitled to keep M&T's provisional funds in the amount of $188,423.13. Rather, M&T would have charged back the provisional funds more quickly.

In other words, the $188,423.13 reflects a portion of the $622,597 that South River Capital was supposed to receive from the payor of the July 7 check. Regardless of when South River Capital learned that the July 7 check had been returned, it still would have owed M&T

---

overdraft. M&T's breach of contract claim arises under the parties' contract, and specifically South River Capital's contractual obligation to repay an overdraft, rather than under its statutory rights pursuant to Maryland Commercial Code. Therefore, arguments regarding whether estoppel is a defense to a statutory right to chargeback provisional funds are inapposite to the contractual counterclaim at issue in this case.

the full amount of the $622,597 check, including the $188,423.13 that South River Capital continues to possess. To the extent that M&T seeks recovery of that $188,423.13, therefore, South River Capital cannot show that such recovery is to its detriment. Rather, recovery would restore $188,423.13 of M&T's provisional funds of which South River Capital currently stands enriched.[18] Accordingly, to the extent M&T seeks recovery of the $188,423.13 negative balance in the Business Account, South River Capital has not met its burden to show the elements of equitable estoppel as a defense to its contractual breach.[19]

### v.    Prejudgment Interest and Attorneys' Fees

For very similar reasons, M&T has established that it is entitled to summary judgment as to its request for prejudgment interest and attorneys' fees. Prejudgment interest in a diversity case is a matter of state substantive law. *Wells Fargo Bank, N.A. v. Gateway Int'l Logistics, Inc.*, Civ. No. JRR-22-2487, 2023 WL 2473255, at *5 (D. Md. Mar. 13, 2023); *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999). Maryland recognizes three forms of prejudgment interest, but M&T seeks only prejudgment interest as of right. (ECF No. 60 at 4.) As Maryland's highest court has explained, a creditor is entitled to pre-judgment

---

[18] To the extent Plaintiff asserts a detrimental reliance argument premised on *Manufacturers Hanover Trust Co. v. Akpan*, 398 N.Y.S.2d 477 (N.Y. Civ. Ct. 1997), New York's Supreme Court, Appellate Division—a higher court than its civil court—explicitly determined that *Akpan* was not applicable where the customer did not detrimentally change position in reliance on the bank's purported failure to timely notify it of a returned check. *Bank of N.Y. v. Asanti, Inc.*, 585 N.Y.S.2d 411, 412 (N.Y. App. Div. 1992). Unlike the customer in *Akpan*, who returned the proceeds of a provisionally cashed check to the *payor* before receiving notice that the check had been returned, Plaintiff in this case has not shown that it detrimentally changed position to the extent it has been able to retain the $188,423.13 overdraft.

[19] For the same reasons, Plaintiff's argument regarding bad faith is unpersuasive. *See* (ECF No. 51 at 19–21). As an initial matter, it is not clear for what purpose Plaintiff raises this argument because it does not explain how the asserted bad faith affects Defendant's counterclaim for breach of contract. *See* (*id.*). Regardless, its assertions of bad faith relate to asserted conduct that post-dates August 18, 2023, which is the date that South River Capital became aware of the overdraft. For the same reasons that South River Capital is unable to show detriment as to its equitable estoppel defense, it is equally unable to show that Defendant's asserted bad faith actions *after* August 18, 2023, affect its ability to recover the sum of the overdraft on August 18, 2023.

interest as of right only where "the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date."[20]  *Md. State Highway Admin. v. Kim*, 726 A.2d 238, 326 (Md. 1999) (quoting *First Va. Bank v. Settles*, 588 A.2d 803, 807 (Md. 1991)).  An obligation and amount are "certain, definite, and liquidated" where they are "calculable," *Harford Cnty. v. Saks Fifth Ave. Distrib. Co.*, 923 A.2d 1, 14 (Md. 2007), or where "the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date," *Bennett v. Ashcraft & Gerel, LLP*, 303 A.3d 1237, 1271 (Md. 2023) (quoting *Nationwide Prop. & Cas. Co. v. Selective Way Ins. Co.*, 248 A.3d 1044, 1051 (Md. 2021)).  Relatedly, an "amount is 'liquidated' if it is 'settled or determined, [especially] by agreement.'" *Bennett*, 303 A.3d at 1271 (quoting *Baltimore Cnty. v. Aecom Servs., Inc.*, 28 A.3d 11, 41 n.19 (Md. Ct. Spec. App. 2011)).  Where there is no statutory prejudgment interest rate, prejudgment interest should be imposed at a rate of six percent per annum.  *Saks Fifth Ave. Distrib. Co.*, 923 A.2d at 14.

In this case, M&T is entitled to prejudgment interest as of right at a rate of six percent per annum, as calculated in its Motion for Summary Judgment.  *See* (ECF No. 42-1 at 4.)  The amount of the unpaid overdraft was liquidated on August 18, 2023, because it was settled and determined that the Business Account had a negative balance of $188,423.13.  It was equally certain and definite because, by withholding payment, South River Capital deprived M&T of

---

[20]  Generally, prejudgment interest as of right "arises under written contracts to pay money on a day certain, such as bills of exchange or promissory notes, in actions on bonds or under contracts providing for the payment of interest, in cases where the money claimed has actually been used by the other party, and in sums payable under leases as rent . . . ."  *Nationwide Prop. & Cas. Co. v. Selective Way Ins. Co.*, 248 A.3d 1044, 1051 (Md. 2021) (quoting *Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001)).

the use of a fixed sum of $188,423.13 as of August 18, 2023. *Md. State Highway Admin.*, 726 A.2d at 326. Moreover, M&T's right to the $188,423.13 arose both under the CDAA and under Maryland's Commercial Code, which, as explained below, protects a collecting bank's right to chargeback an overdraft. *See* (ECF No. 42 Ex. 3 at 7 § 15); MD. CODE ANN., COM. LAW § 4-214(a).

Relatedly, under the CDAA, M&T is entitled to attorneys' fees incurred "in collecting Amounts Due or enforcing the Agreement." (ECF No. 42 Ex. 3 at 10 § 24(b).) As explained above, South River Capital has identified no genuine dispute of material fact as to the terms or applicability of the CDAA. By the plain language of the Section 24(b) of the CDAA, M&T is entitled to attorneys' fees it has incurred in relation to its effort to recoup the overdraft amount of $188,423.13 as of August 18, 2023.[21] At this time, however, it is not entitled to attorneys' fees incurred in relation to its defense against Plaintiff's claim because those fees were not incurred in relation to its efforts to enforce the Agreement.

---

[21] South River Capital raises no argument regarding prejudgment interest or attorneys' fees. To the extent that it intended to assert its equitable estoppel argument against such interest and fees, estoppel is inapplicable. Both the prejudgment interest and the attorneys' fees are costs that arose *after* South River Capital became aware of the overdraft on August 18, 2023, and South River Capital's estoppel arguments relate entirely to M&T's conduct *before* August 18, 2023. *See* (ECF No. 51 at 18–19.)

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 42) is GRANTED, including attorneys' fees and prejudgment interest. Where a court grants summary judgment to adjudicate some but not all disputes in a matter, "the judgment is interlocutory in nature and does not become final unless the Court expressly determines under Rule 54(b) of the Federal Rules of Civil Procedure that there is no reason for delay in execution and expressly directs entry of judgment." *Chemetron Corp.*, 92 F.R.D. at 30. In this case, M&T has represented that "[i]f, before entry of final judgment, some setoff is required, so be it." (ECF No. 60 at 5 n.4.) Plaintiff's claim against M&T remains pending, and the potential need for setoff before final adjudication of this case precludes entry of final judgment at this time.

A separate Order follows.

Date: October 28th, 2025

/s/
_____
Richard D. Bennett
United States Senior District Judge